The SECURITY BANK & TRUST CO.

v.

The UNITED STATES.

No. 268–80C.

United States Claims Court.

June 6, 1983.

Ralph W. Newcombe, Lawton, Okl., for plaintiff; Newcombe & Redman, Inc., Lawton, Okl., of counsel.

Margaret E. McCloskey, Washington, D.C., for defendant; Asst. Atty. Gen., J. Paul McGrath, Washington, D.C., of counsel.

MEMORANDUM OF DECISION

WHITE, Senior Judge.

The Security Bank & Trust Company ("the Bank" or "the plaintiff"), which is located in Lawton, Oklahoma, bases this action upon an alleged breach of contract by the Small Business Administration ("the SBA").

The court concludes that the plaintiff is not entitled to recover.

### The KP Contract and Subcontract

The events upon which the action is based arose in connection with the SBA's so-called section 8(a) program.[1] Under the section 8(a) program, various government contracts are set aside for socially or economically disadvantaged contractors. In carrying out the program, government agencies enter into contracts with the SBA for the performance of services or the furnishing of supplies, and the SBA, in turn, subcontracts with disadvantaged firms to perform the services or furnish the supplies involved in the prime contracts.

As part of the section 8(a) program in the State of Oklahoma, the Department of the Army at Fort Sill, Oklahoma, on September 20, 1976, entered into contract No. DABT39–76–C–3164 ("the KP contract") for the performance of food services at Fort Sill. Then, on October 1, 1976, the SBA entered into subcontract No. SB6328(a)77C–700 ("the subcontract") with Bluford Services Company ("Bluford Services"), a disadvantaged firm owned and operated by Foxie W. Bluford ("Mr. Bluford"), for the performance of the same services involved in the KP contract. The KP contract and subcontract were originally to run from October 1, 1976, to September 30, 1977, but the term was later extended on three separate occasions, with the final termination date under the third extension being fixed as September 30, 1978.

Mr. Bluford, from the beginning of operations under the subcontract, suffered from a chronic lack of funds, and often had difficulty in covering his payroll. He survived "from payroll to payroll."

Sometime in March 1977, two representatives from the SBA and Mr. Bluford went to the Bank and conferred with Perman Henderson ("Mr. Henderson"), who was a loan officer and vice president of the Bank, concerning the possibility of the Bank extending a line of credit to Mr. Bluford in the amount of $80,000, so that Mr. Bluford could meet his payroll in connection with the performance of the subcontract at Fort Sill. It was proposed that the collateral for any loans to be made under the line of credit would be an assignment to the Bank of the proceeds under the subcontract.

The Bank, for some time, had been very cooperative toward the SBA and had rendered assistance to the SBA in connection with its operations in Oklahoma. Mr. Henderson obtained a copy of Mr. Bluford's financial statement and a history of what had taken place in connection with the performance of the subcontract. He then submitted to the Bank's Discount Committee, with a favorable recommendation, an application from Mr. Bluford, d/b/a Bluford Services Company, for a line of credit in the amount of $80,000.

The Bank's Discount Committee approved Mr. Bluford's application, and an $80,000 line of credit was granted to Mr. Bluford, d/b/a Bluford Services Company. As extended, the line of credit remained in effect until September 30, 1978, which was the final date of the term of the KP contract and subcontract, as fixed in the last contract extension.

As security for the line of credit previously mentioned, Mr. Bluford on March 31, 1977, executed an assignment to the Bank of the subcontract proceeds. The Bank sent a notice of the assignment to the Department of the Army at Fort Sill, and the assignment was acknowledged by the contracting officer on April 6, 1977, and by the Fort Sill Finance Office on May 13, 1977.

After obtaining the line of credit, it was Mr. Bluford's practice to go to the Bank, talk to Mr. Henderson, ask for a loan in the amount of $80,000, and sign a promissory note for it. The money from the loan would be deposited in the payroll account of Bluford Services. This occurred twice a month, with an interval of approximately 15–17 days between notes. Mr. Bluford was supposed to pay off any pending loan before receiving a new one.

Before the assignment of March 31, 1977, was executed by Mr. Bluford, checks due under the subcontract were made payable

1. The legislation authorizing the program was       codified as 15 U.S.C. § 637(a) (1976).

to Bluford Services and were mailed by Fort Sill to Mr. Bluford. After the assignment became effective, checks due under the subcontract were made payable to Bluford Services in care of the Bank, and were mailed by Fort Sill to the Bank.

When a check was received by the Bank from Fort Sill, payable to Bluford Services in care of the Bank, Mr. Henderson deposited the proceeds of the check in Mr. Bluford's payroll account, after deducting the amount due the Bank on the loan which the Bank had made for the period covered by the check. This customarily happened twice each month. Mr. Bluford would learn that a check had been received by the Bank because Mr. Henderson would call him on the telephone and inform him.

On or about February 25, 1978, by Modification No. 0025, the KP contract was modified to state in part as follows:

By mutual agreement, this contract can be terminated for convenience of the Government in the event a contract is awarded on IFB DABT39–77–B–0066, Cook and KP service, Fort Sill, Oklahoma, at any time prior to the expiration of this contract as extended through 30 September 1978, and the effective date for a termination for convenience of the Government of Contract DABT39–76–C–3164 will be at the end of the month in which a new contract is awarded on IFB DABT39–77–B–0066.

### The Promise

On March 10, 1978, Robert K. Ball ("Mr. Ball"), who was then the Acting District Director of the SBA in the Oklahoma City District Office and the only official in that office with contracting authority, mailed to Mr. Henderson a copy of the contract modification quoted in the preceding paragraph. In a convering letter addressed to Mr. Henderson, Mr. Ball stated in part as follows:

An extension to this contract through September 30, 1978 has just been executed on Modification No. 0025 (copy attached) between Fort Sill, SBA and Bluford. This extension was issued due to the fact that Fort Sill has not been able to award a contract to a responsible bidder on their IFB issued by them in July, 1977. It is our opinion that an award will not be made on this within the remaining period. If one is made, SBA and Bluford will be given at least a 30-day notice. If this does come into effect, this office will immediately notify you of the termination date.

* * * Your bank has an assignment on this contract in which all monies are received at your bank prior to being received by Bluford. Bluford is paid twice a month, once on the 15th in which he receives $135,000 for this period, and at the close of the month in which his check is for over $100,000. Your records at the bank should indicate this. You may want to consider raising his line of credit to $100,000.

### Termination for Convenience of Government

On or about August 24, 1978, the Department of the Army notified Bluford Services and the SBA that the KP contract and the subcontract would be terminated effective August 31, 1978.

Despite the promise contained in the SBA's letter of March 10, 1978, neither the SBA nor Mr. Bluford gave the Bank any notice, oral or written, between August 24 and August 31, 1978, that the KP contract and subcontract would be terminated effective August 31, 1978. Moreover, neither the SBA nor Mr. Bluford gave the Bank any notice, oral or written, during the month of September 1978 that the KP contract and subcontract had been terminated effective August 31, 1978. In fact, the Bank did not learn from any source about the termination of the KP contract and subcontract until sometime after October 17, 1978. Consequently, throughout the month of September, the Bank proceeded in the belief that the KP contract and subcontract would continue in existence until the regularly scheduled termination date of September 30, 1978.

On August 30, 1978, the Department of the Army at Fort Sill awarded a new food

service contract directly to Mr. Bluford, d/b/a Bluford Services Company, for a 1-month period commencing September 1 and continuing through September 30, 1978. No formal assignment was executed with regard to this 1-month direct contract.

On September 8, 1978, Mr. Bluford went to the Bank and obtained a loan of $80,000 from Mr. Henderson. Then, on September 22, 1978, Mr. Bluford went to the Bank and obtained another $80,000 loan from Mr. Henderson. Both of these loans were made under the $80,000 line of credit mentioned earlier in the opinion. When they were made, Mr. Henderson believed that the KP contract and subcontract were still in effect, and that the Bank was protected by the March 31, 1977, assignment to the Bank of the subcontract proceeds.

The $80,000 loan of September 22, 1978, was never repaid by Mr. Bluford, and it is the basis for this action.

The Bank was fully repaid for all loans which it made to Mr. Bluford in connection -with the performance of the subcontract. All checks in payment for services rendered under the subcontract were made payable to Bluford Services in care of the Bank and were mailed to the Bank, which made a deduction from each check to cover the loan for the period represented by the payment, and deposited the remainder of the proceeds from the check to Mr. Bluford's payroll account. Also, the $80,000 loan which the Bank made to Mr. Bluford on September 8, 1978, was paid off on September 25, 1978, with part of the proceeds from a Fort Sill check to Bluford Services, which was in payment for work done under the September 1978 1-month direct contract between Fort Sill and Mr. Bluford. This check was made payable to, and was mailed directly to, Bluford Services, and was taken by Mr. Bluford to the Bank, where it was handled in the customary manner by Mr. Henderson (i.e., he deducted the amount due the Bank on the September 8 loan and deposited the remainder of the proceeds in Mr. Bluford's payroll account).

## Discussion

In its requested findings of fact, the defendant asked (among other things) that the court make findings to the effect that "[t]he Bank did not promise or do anything for the SBA in return for Mr. Ball's statement in the March 10, 1978 letter that the SBA would give the Bank notice of a termination for convenience," and that "neither Mr. Ball nor any other individual at the SBA received any promise or act in return or response to its letter of March 10, 1978."

Then, in its brief, the defendant stated in part as follows:

> Thus, here, the fact that consideration, an essential element of a contract, was lacking is fatally defective to the Bank's alleged contract theory. * * * The SBA's letter, at best, made a gratuitous goodwill offer of assistance, which is not sufficient to establish a legally obligatory contract. * * *

As stated by the defendant, consideration is an essential ingredient of a contract. *Farrington v. Tennessee,* 95 U.S. 679, 685, 24 L.Ed. 558 (1877). To constitute consideration, a performance or a return promise must be bargained for. Restatement (Second) of Contracts § 71(1).

This court's predecessor, the U.S. Court of Claims, in *Estate of Samuel E. Bogley v. United States,* 206 Ct.Cl. 695, 514 F.2d 1027 (1975), used the following language in summarizing the essential elements of a contract (206 Ct.Cl. at 704, 514 F.2d at 1032):

> It is fundamental that in order to have a valid contract one party must make an offer that is a promise which is conditional upon receipt by the offeror of some act or promise [*i.e.,* consideration] from the offeree, and the offer must be accepted as to all its terms by the offeree. * * *

In the present case, there was clearly a promise made by the SBA, but the scope of the promise and the return promise or performance (if any) which the SBA bargained for in exchange for the promise require discussion. Ostensibly, the promise, as set out in the SBA's letter of March 10, 1978, was to "immediately notify * * * [the Bank] of the termination date" in the event

of the termination of the KP contract and subcontract for the convenience of the Government. This specific promise, however, was part of a larger whole.

The letter of March 10, 1978, as previously quoted, was obviously designed to induce the Bank to continue making loans to Mr. Bluford in connection with the performance of the subcontract, by reassuring the Bank that it would not sustain any financial loss by making such loans, because (1) under the assignment of the subcontract proceeds, the Bank would directly receive all payments due under the subcontract; and (2) as further protection for the Bank, the SBA would immediately notify the Bank if a decision to terminate the KP contract and subcontract were to be made before the expiration of the extended contract date of September 30, 1978. In essence, therefore, the SBA was bargaining for performance, rather than a promise, by the Bank (*i.e.*, the continued making of loans to Mr. Bluford in order that the subcontract might be completed) in exchange for the SBA's assurance that the Bank would receive repayment for such loans.

The SBA was interested in, and only in, the continued making of loans by the Bank to Mr. Bluford in connection with the completion of the subcontract. Nowhere in the letter of March 10, 1978, was there any express or implied request that the Bank do anything by way of rendering financial assistance to Mr. Bluford in connection with any other contract or subcontract (such as the September 1978 1-month direct contract between Fort Sill and Mr. Bluford). Conversely, there was no express or implied assurance in the letter that the Bank would be repaid for loans made in connection with other contracts or subcontracts. Accordingly, the loan which the Bank made to Mr. Bluford on September 22, 1978, and on which the present action is based, was outside the scope of the agreement between the SBA and the Bank arising from the letter of March 10, 1978.

---

**2.** Cases "sounding in tort" are excluded from this court's jurisdiction by 28 U.S.C. § 1491, *as amended by* section 133(a) of the Federal

It necessarily follows that the Bank's damages claim based upon an alleged breach of contract by the SBA cannot be sustained.

When Mr. Bluford went to the Bank on September 22, 1978, and asked for another loan in the customary amount of $80,000, and said nothing about the termination of the KP contract and subcontract on which the SBA had assisted him in obtaining the $80,000 line of credit from the Bank, his silence on this point was, in substance, a misrepresentation to the Bank that he was still working on the subcontract. This misrepresentation was the basic cause of the Bank's loss in connection with the $80,000 loan of September 22, 1978.

Despite the conclusion that the Government is not legally obligated to reimburse the Bank, on a breach of contract theory, for any loss sustained in connection with the September 22, 1978, loan to Mr. Bluford, the fact remains that the SBA—perhaps as an obligation to use due care to avoid causing harm to the interests of others,[2] and at least as a matter of common courtesy and a desire to retain the confidence of the public in the integrity of the agency—should have given the Bank timely notice regarding the termination of the KP contract and subcontract. The Bank, in the absence of such notice, ultimately sustained a financial loss on the $80,000 loan of September 22, 1978, which the Bank would not have made if it had known that the KP contract and subcontract, and, therefore, the assignment of the subcontract proceeds, had been terminated. The Bank has reason to feel aggrieved.

### CONCLUSION OF LAW

On the basis of the foregoing opinion and the facts, as found by the court and stated in the opinion and in the contemporaneous findings of fact, the court concludes as a matter of law that the plaintiff is not entitled to recover.

---

Courts Improvement Act of 1982 (Pub.L. 97–164, 96 Stat. 25, 39).

The complaint will therefore be dismissed.

IT IS SO ORDERED.

## THE SECURITY BANK AND TRUST CO.

### No. 268–80C

### FINDINGS OF FACT

#### Cast of Characters

1. Perman Henderson ("Mr. Henderson") is a loan officer and vice president at The Security Bank & Trust Company ("the Bank") in Lawton, Oklahoma. He held these positions during the 1974–78 period. His duties are to make loans and collect them. He has been employed by the Bank for approximately 32 years. During part of that period, he was a teller. As a teller, he was trained to look at checks for a variety of purposes, and one purpose was to determine who endorsed the check.

2. Robert K. Ball ("Mr. Ball") is the District Director of the United States Small Business Administration ("SBA") in the Oklahoma City District Office. He is generally responsible for the SBA operations in the State of Oklahoma. He has held the position since June 1980. During March 1978, Mr. Ball was the Acting District Director.

3. (a) Jack Rylant ("Mr. Rylant") was employed by the SBA as a business specialist in their Section 8(a) program (see finding 7(c)). In this capacity, he handled Foxie W. Bluford's Section 8(a) subcontract with the SBA at Fort Sill, Oklahoma. Mr. Rylant did not have contracting authority to act on behalf of the SBA.

(b) Mr. Rylant was under Mr. Ball's supervision at the times relevant to this case.

4. (a) Foxie W. Bluford ("Mr. Bluford") is now employed as a food service supervisor at Sheppard Air Force Base, Texas. During the 1976–78 period, he was self-employed and was operating a food service business through his corporation known as Bluford Services Company.

(b) Before forming Bluford Services Company, Mr. Bluford operated through a company known as Triple S Enterprises, Inc. He was sponsored and financed at that time by ABC Food Service, a Texas company.

#### Mr. Bluford and the Bank

5. (a) Mr. Bluford, doing business as Bluford Services Company ("Bluford Services") and, earlier, as Triple S Enterprises, Inc. ("Triple S"), did business with the Bank beginning in July 1974. Their first relationship was in connection with a $150,000 direct loan to Mr. Bluford from the Dallas office of the SBA. That loan was handled by the Bank (without charge) on behalf of the SBA.

(b) In July 1975, Mr. Bluford received another direct loan from the Dallas SBA office for $300,000. Again, the loan was handled through the Bank (which did not make any charge).

(c) Mr. Bluford continued to do business with the Bank through October 1978.

(d) From the beginning, and throughout the course of his dealings with the Bank, Mr. Bluford normally dealt with Mr. Henderson.

6. With respect to the transactions mentioned in finding 5, the Bank experienced problems in making collections from Mr. Bluford and transmitting the money to the SBA, as Mr. Bluford was constantly getting himself into financial "jams."

#### The Contract and Subcontract

7. (a) On September 20, 1976, the SBA and the Department of the Army at Fort Sill, Oklahoma, entered into contract No. DABT 39–76–C–3164 ("the prime contract") for the performance of food services (sometimes referred to as "KP" services) at Fort Sill.

(b) On October 1, 1976, the SBA entered into subcontract No. SB6328(a)77C–700 ("the subcontract") with Bluford Services, a disadvantaged firm, for the performance of the same services involved in the prime contract.

(c) The actions mentioned in paragraphs (a) and (b) of this finding were undertaken as part of the SBA's Section 8(a) program,[1] in which various government contracts are set aside for socially or economically disadvantaged contractors. The program is carried out by means of government agencies extending contracts to the SBA, and the SBA, in turn, subcontracting with disadvantaged firms to perform the services or furnish the supplies involved in the prime contracts.

(d) The subcontract did not involve any SBA guaranteed funds.

8. The work under the prime contract and the subcontract was performed solely by Mr. Bluford, d/b/a Bluford Services.

9. The prime contract and the subcontract were originally to run from October 1, 1976, to September 30, 1977. They were then extended to November 30, 1977, and, later, to February 28, 1978. On or before February 28, 1978, the contract and the subcontract were extended again to September 30, 1978.

10. Mr. Bluford, from the beginning of operations under the subcontract, suffered from a chronic lack of funds, and often had difficulty in covering his payroll. He survived "from payroll to payroll." Mr. Henderson was aware of this.

### The Line of Credit and Assignment

11. (a) Sometime in March 1977, a representative of the Dallas SBA office, a representative of the Oklahoma City SBA office, and Mr. Bluford went to the Bank and conferred with Mr. Henderson concerning the possibility of the Bank extending a line of credit to Mr. Bluford in the amount of $80,000, so that Mr. Bluford could meet his payroll in connection with the performance of the subcontract at Fort Sill. It was proposed that the collateral for any loans to be made under the line of credit would be an assignment to the Bank of the proceeds under the subcontract.

(b) The Bank, for some time, had been very cooperative toward the SBA and had rendered assistance to the SBA in connection with the latter's operations in Oklahoma.

12. (a) Mr. Henderson obtained a copy of Mr. Bluford's financial statement and a history of what had taken place in connection with the performance of the subcontract. He then submitted to the Bank's Discount Committee, with a favorable recommendation, an application from Mr. Bluford, d/b/a Bluford Services Company, for a line of credit in the amount of $80,000.

(b) The Bank's Discount Committee approved Mr. Bluford's application, and an $80,000 line of credit was granted to Mr. Bluford, d/b/a Bluford Services Company.

(c) As security for this line of credit, Mr. Bluford, on March 31, 1977, executed an assignment to the Bank of the subcontract proceeds.

(d) The Bank later sent a Notice of Assignment to the Department of the Army. The assignment was acknowledged by the contracting officer on April 6, 1977, and by an official of the Finance Office at Fort Sill on May 13, 1977.

13. The Bank made the first loan to Mr. Bluford under the line of credit on May 9, 1977.

### Extensions of Mr. Bluford's Line of Credit

14. The Bank's Discount Committee held a meeting on December 16, 1977. At that time, following Mr. Henderson's favorable recommendation, the Discount Committee approved an extension in Mr. Bluford's line of credit in the amount of $80,000 for the months of January, February, and March of 1978. This was in conformance with the Bank's policy of only approving lines of credit to begin at a future date.

15. (a) The line of credit between Mr. Bluford and the Bank worked as follows: Mr. Bluford would go to the Bank, talk to Mr. Henderson, ask for a loan in the amount of $80,000, and sign a promissory note for it. The money from the loan would be deposited in the payroll account of

1. The pertinent legislation was codified as 15 U.S.C. § 637(a) (1976).

Bluford Services. This occurred twice a month, with approximately 15–17 days between notes. Mr. Bluford was supposed to pay off any pending loan before receiving a new one.

(b) Mr. Bluford and Mr. Henderson had the opportunity to, and in fact did, engage in conversations on the occasions when Mr. Bluford went to the Bank for a new loan.

16. Typically, an assignment of proceeds under a government contract works as follows: A lender loans money to a contractor and takes an assignment of the contract proceeds. After the proper filing and acknowledgment of the assignment, the proceeds from the contract are disbursed in the form of checks, which are made payable to the contractor in care of the assignee and which are mailed to the assignee.

17. The required procedures in the Finance Office at Fort Sill, when that office receives a formal assignment of a contract, are as follows: The Finance Office receives a copy of the assignment and requires the Procurement Office to acknowledge it. Thereafter, each payment voucher is made out to show the assignor and assignee. Payment under the contract is then mailed directly to the assignee.

18. (a) Before the assignment of March 31, 1977, was executed by Mr. Bluford, checks due under the subcontract were made payable to Bluford Services and were mailed by Fort Sill to Mr. Bluford.

(b) After the assignment became effective, checks due under the subcontract were made payable to Bluford Services in care of the Bank and were mailed by Fort Sill to the Bank. Mr. Bluford would learn that a check had been received by the Bank because Mr. Henderson would call him on the telephone and inform him.

(c) When a check was received by the Bank from Fort Sill, Mr. Henderson deposited the proceeds of the check into Mr. Bluford's payroll account, after deducting the amount due the Bank on the loan which the Bank had made for the period covered by the check. This customarily happened twice each month.

(d) After the assignment went into effect, each check received by the Bank from Fort Sill under the subcontract was made out as payable to:

Bluford Services Co.
c/o Security Bank & Trust Company
Drawer 489
Lawton, OK 73501.

(e) Every check issued in payment under the subcontract, beginning in May 1977 and continuing until the last payment was made, had the Bank's name on it and was mailed to the Bank.

19. In July 1977, two loans were made to Mr. Bluford, in the total amount of $50,-000, that were outside the $80,000 line of credit. There was no additional collateral, beyond the assignment of the Fort Sill subcontract proceeds, required for these loans.

20. On January 27, 1978, Bluford Services, by Foxie Bluford, executed a Financing Statement and Security Agreement to the Bank, giving the Bank a security interest in "all accounts receivable and contract rights now owned and hereafter acquired and all proceeds therefrom." Subsequently, this document was filed by the Bank in the appropriate filing office.

## *Modification of the Contract*

21. (a) On or about February 25, 1978, by Modification No. 0025, the term of the prime contract and of the subcontract was extended through September 30, 1978.

(b) In addition, the prime contract was modified to state in part as follows:

By mutual agreement, this contract can be terminated for convenience of the Government in the event a contract is awarded on IFB DABT39–77–B–0066, Cook and KP service, Fort Sill, Oklahoma, at any time prior to the expiration of this contract as extended through 30 September 1978, and the effective date for a termination for convenience of the Government of Contract DABT39–76–C–3164 will be at the end of the month in which a new contract is awarded on IFB DABT39–77–B–0066.

(c) This modification was signed by Mr. Bluford, the SBA, and the Department of the Army.

22. On or about March 3, 1978, Mr. Henderson was informed by Mr. Rylant orally that the prime contract had been modified to include a provision giving the Government the right to terminate the contract for convenience. Mr. Rylant stated, in this connection, that if the prime contract were to be terminated at any time, Mr. Henderson would have plenty of advance notice, so that the Bank would be protected.

23. On March 10, 1978, Mr. Ball sent a letter to Mr. Henderson relative to the modification of the contract mentioned in finding 21, and attached a copy of the modification. Mr. Ball's letter stated in pertinent part as follows:

An extension to this contract through September 30, 1978 has just been executed on Modification No. 0025 (copy attached) between Fort Sill, SBA and Bluford. This extension was issued due to the fact that Fort Sill has not been able to award a contract to a responsible bidder on their IFB issued by them in July, 1977. It is our opinion that an award will not be made on this within the remaining period. If one is made, SBA and Bluford will be given at least a 30-day notice. If this does come into effect, this office will immediately notify you of the termination date.

* * * Your bank has an assignment on this contract in which all monies are received at your bank prior to being received by Bluford. Bluford is paid twice a month, once on the 15th in which he receives $135,000 for this period, and at the close of the month in which his check is for over $100,000. Your records at the bank should indicate this. You may want to consider raising his line of credit to $100,000.

24. In the letter of March 10, 1978, Mr. Ball suggested that the Bank might want to raise Mr. Bluford's line of credit to $100,000.

25. The Bank did not raise Mr. Bluford's line of credit to $100,000, or change in any way its conduct with respect to Mr. Bluford's line of credit.

26. Mr. Ball was the only individual at the SBA Oklahoma City Regional Office with contracting authority to act for the United States.

27. On March 17, 1978, after Mr. Henderson received Mr. Ball's letter of March 10, 1978, the Bank's Discount Committee held a meeting and approved an extension of Mr. Bluford's line of credit for a period of 6 months.

28. On June 29, 1978, the Bank loaned Bluford Services $80,000. On July 14, 1978, the Bank made an additional loan of $80,000 to Bluford Services. The June 29, 1978, loan was not paid until July 20, 1978. Therefore, for the period from July 14 through July 20, 1978, there was an indebtedness of $160,000 owed by Bluford Services to the Bank. Mr. Henderson did not require Mr. Bluford to supply any additional security for the amount of the loan that exceeded the $80,000 line of credit authorized by the Bank's Discount Committee.

*Termination of the Contract*

29. (a) On or about August 24, 1978, the Department of the Army notified Bluford Services and the SBA that the prime contract and the subcontract would be terminated effective August 31, 1978.

(b) Neither the SBA nor Mr. Bluford gave the Bank any advance notice, oral or written, that the prime contract and the subcontract would be terminated effective August 31, 1978, or any notice, oral or written, during the month of September 1978 that the prime contract and subcontract had been terminated effective August 31, 1978. In fact, the Bank did not learn from any source about the termination of the prime contract and subcontract until sometime after October 17, 1978.

(c) Throughout the period from August 24, 1978, until the end of September 1978, the Bank proceeded in the belief that the prime contract and subcontract would continue in existence until the regularly sched-

uled termination date of September 30, 1978.

### Events After Notice of Termination

30. On August 30, 1978, the defendant, acting through the Department of the Army at Fort Sill, Oklahoma, awarded a new food service contract at Fort Sill directly to Mr. Bluford, d/b/a Bluford Services Company, for a 1-month period, extending from September 1 through September 30, 1978. This contract was numbered DABT39–78–C–3202. No formal assignment was executed with regard to this 1-month direct contract.

31. As of August 31, 1978, the payroll account of Bluford Services at the Bank reflected a negative balance of $782.85. This was only 6 days after Mr. Bluford had received his most recent check, and it was 11 days before he was due to receive his next check, from Fort Sill under the subcontract.

32. (a) On September 1, 1978, Mr. Henderson presented to the Discount Committee an application from Mr. Bluford for a 30-day extension of the line of credit, to run from September 1 through September 30, 1978, in the amount of $80,000. Mr. Henderson recommended that the extension be approved, and his recommendation was followed by the Discount Committee.

(b) In extending Mr. Bluford's line of credit on September 1, 1978, the Bank was acting in the belief that the prime contract and subcontract were still in effect.

33. (a) On September 8, 1978, Mr. Bluford went to the Bank and obtained a loan of $80,000 from Mr. Henderson. On that date, the most recent previous loan to Mr. Bluford had been made on August 25, 1978, in the amount of $80,000, and the August 25 loan had not been paid off by Mr. Bluford. Accordingly, as of September 8, 1978, Mr. Bluford owed the Bank a total of $160,000, or $80,000 beyond Mr. Bluford's line of credit at the Bank. Mr. Henderson did not require Mr. Bluford to provide any additional security in connection with the September 8, 1978, transaction.

(b) At the time when the September 8, 1978, loan was made, Mr. Henderson and the Bank were unaware that the prime contract and subcontract had been terminated effective August 31, 1978.

(c) The $80,000 loan that the Bank made to Mr. Bluford on August 25, 1978, was paid off on September 11, 1978.

34. (a) On September 11, 1978, the final check from Fort Sill, in the amount of $107,054.53, under the prime contract and the subcontract was received by the Bank. The sum of $80,000 was deducted in order to pay off Mr. Bluford's note of August 25, 1978, and the remainder was deposited to the payroll account of Bluford Services.

(b) The check referred to in paragraph (a) of this finding was made payable as follows, in accordance with the practice uniformly followed ever since the assignment to the Bank of the proceeds under the subcontract:

Bluford Services Company
c/o Security Bank & Trust Company
Drawer 489
Lawton, Oklahoma 73501

35. (a) On September 22, 1978, the Bank loaned Mr. Bluford $80,000. On that date, the $80,000 which had been loaned to Mr. Bluford on September 8, 1978, had not been paid off, with the result that, as of September 22, 1978, Bluford Services was indebted to the Bank in the total amount of $160,000, or $80,000 beyond Mr. Bluford's line of credit at the Bank.

(b) At the time when the loan was made to Mr. Bluford on September 22, 1978, Mr. Henderson and the Bank were not aware that the prime contract and subcontract had been terminated effective August 31, 1978.

(c) The Bank has not been repaid the $80,000 which it loaned to Mr. Bluford on September 22, 1978.

36. If the Bank had known on September 8 and 22, 1978, that the prime contract and the subcontract had been terminated effective August 31, 1978, the Bank would not have made additional loans to Mr. Bluford.

37. (a) On or about September 25, 1978, Mr. Bluford went to the Bank, having in his possession a check from Fort Sill dated September 22, 1978, and in the amount of $110,000. This check had been mailed to Mr. Bluford by Fort Sill, it represented a payment for services under the 1-month direct contract mentioned in finding 30, and it was made payable as follows:

Bluford Services Company
P.O. Box 343
Lawton, Oklahoma 73501

(b) This change in payee and addressee was a deviation from a long-term pattern of more than 30 checks issued under the subcontract, all of which had been mailed to the Bank and which had been made payable as follows:

Bluford Services Company
c/o Security Bank & Trust Company
Drawer 489
Lawton, Oklahoma 73501

(c) Mr. Bluford delivered the September 22, 1978, check to Mr. Henderson, who went through his regular procedure in connection with the processing of Bluford Services' checks. He deducted the amount of $80,000 in payment of the loan which the Bank had made to Mr. Bluford on September 8, 1978, and he credited the remainder to Mr. Bluford's payroll account. None of the proceeds from this check was applied on the loan which the Bank had made to Mr. Bluford on September 22, 1978.

38. On or about October 10, 1978, while Mr. Bluford was at Fort Sill, the Fort Sill Finance Office delivered to him a check in the amount of $85,378.84, representing the last payment for services under the 1-month direct contract referred to in finding 30. Mr. Bluford used the proceeds from this check to purchase two cashier's checks, one in the amount of $50,000 and the other in the amount of $35,000. He used the $35,000 cashier's check to pay off a loan which he had previously obtained from the Sheppard Air Force Base Credit Union, and he deposited the $50,000 cashier's check in his payroll account at the Bank.

39. On October 13, 1978, Mr. Henderson called Mr. Bluford on the telephone because Mr. Bluford's accounts at the Bank were overdrawn. Mr. Bluford's payroll account was overdrawn in the amount of approximately $3,500 and his special account was overdrawn in the amount of approximately $200. Mr. Bluford deposited $3,500 in his payroll account on October 13, 1978.

40. Sometime after learning that Mr. Bluford had been injured in an automobile accident on October 17, 1978, Mr. Henderson inquired of the Department of the Army at Fort Sill for the first time as to whether Mr. Bluford was due any further payment for his services under the prime contract and subcontract. It was on that occasion that Mr. Henderson learned for the first time that the contract and the subcontract had been terminated by the Department of the Army on August 24, 1978, effective August 31, 1978.

41. (a) On November 6, 1978, the Bank filed an action against Mr. Bluford in the District Court of Comanche County, Oklahoma. The complaint sought to recover the balance due on the September 22, 1978, loan and relied upon the Financial Statement and Security Agreement which Mr. Bluford had executed on January 27, 1978 (see finding 20). The prayer sought as relief a writ of attachment on Mr. Bluford's property, as well as a judgment against Mr. Bluford in the amount of $80,000, plus interest, attorney's fees, and costs.

(b) On or about February 22, 1979, the Bank recovered $5,800 as proceeds from an auction of some of Mr. Bluford's janitorial equipment. Although the auction was a result of the November 6, 1978, action based on the $80,000 loan of September 22, 1978, which asked for a writ of attachment on Mr. Bluford's property, the proceeds from the sale of the property were not applied to the September 22, 1978, loan but, instead, were applied to a later loan which the Bank had made to Mr. Bluford on October 10, 1978, and which was secured by an assignment under another government contract.

42. On June 19, 1980, Mr. Bluford filed a voluntary petition in bankruptcy. He has

not been discharged from his debt to the Bank.

