731 F.2d 861
 32 Cont.Cas.Fed. (CCH) 72,352
 The SECURITY BANK & TRUST CO., Appellant,
v.
The UNITED STATES, Appellee.
 Appeal No. 83-1267.
 United States Court of Appeals,
Federal Circuit.
 April 5, 1984.
 
 Edward W. Dzialo, Jr., Lawton, Okl., argued for appellant.
 Margaret E. McCloskey, Washington, D.C., argued for appellee. With her on brief were Richard K. Willard, Acting Asst. Atty. Gen., David M. Cohen, Director and Sandra P. Spooner, Washington, D.C.
 Before BENNETT, Circuit Judge, SKELTON, Senior Circuit Judge, and MILLER, Circuit Judge.
 SKELTON, Senior Circuit Judge.
 
 
 1
 This is an appeal from a decision of the Claims Court in No. 268-80C, The Security Bank and Trust Co. v. U.S., decided June 6, 1983, 2 Cl.Ct. 646 (1983), in which the court held that the appellant Security Bank and Trust Co. is not entitled to recover on an alleged breach of contract claim. We affirm.
 
 
 2
 The Security Bank and Trust Co. of Lawton, Oklahoma, (appellant or plaintiff, or the Bank) filed this suit to recover money damages from the United States for an alleged breach of contract by the Small Business Administration (SBA) in connection with the SBA's section 8(a) program codified as 15 U.S.C. Sec. 637(a) (1976). Under this program, various government contracts are set aside for socially or economically disadvantaged contractors. In carrying out the program, government agencies enter into contracts with the SBA for the performance of services or the furnishing of supplies, and the SBA, in turn, subcontracts with disadvantaged firms to perform the services or furnish the supplies involved in the prime contracts. The facts in the instant case are substantially as follows.
 
 
 3
 As part of the section 8(a) program in the State of Oklahoma, the Department of the Army at Fort Sill, Oklahoma, on September 20, 1976, entered into contract No. DABT39-76-C-3164 ("the KP contract") for the performance of food services at Fort Sill. On October 1, 1976, the SBA entered into subcontract No. SB6328(a)77C-700 ("the subcontract") with Bluford Services Company ("Bluford Services"), a disadvantaged firm owned and operated by Foxie W. Bluford ("Mr. Bluford"), for the performance of the same services involved in the KP contract. The KP contract and subcontract were originally to run from October 1, 1976, to September 30, 1977, but the term was later extended on three separate occasions, with the final termination date under the third extension being fixed as September 30, 1978.
 
 
 4
 Mr. Bluford, from the beginning of operations under the subcontract, suffered from a chronic lack of funds, and often had difficulty in covering his payroll. He survived "from payroll to payroll."
 
 
 5
 Sometime in March 1977, two representatives from the SBA and Mr. Bluford went to the Bank and conferred with Perman Henderson ("Mr. Henderson"), who was a loan officer and vice president of the Bank, concerning the possibility of the Bank extending a line of credit to Mr. Bluford in the amount of $80,000, so that Mr. Bluford could meet his payroll in connection with the performance of the subcontract at Fort Sill. It was proposed that the collateral for any loans to be made under the line of credit would be an assignment to the Bank of the proceeds under the subcontract.
 
 
 6
 Mr. Henderson obtained a copy of Mr. Bluford's financial statement and a history of what had taken place in connection with the performance of the subcontract. He then submitted to the Bank's Discount Committee, with a favorable recommendation, an application from Mr. Bluford, d/b/a Bluford Services Company, for a line of credit in the amount of $80,000.
 
 
 7
 The Bank's Discount Committee approved Mr. Bluford's application, and an $80,000 line of credit was granted to Mr. Bluford, d/b/a Bluford Services Company. As extended, the line of credit remained in effect until September 30, 1978, which was the final date of the term of the KP contract and subcontract, as fixed in the last contract extension.
 
 
 8
 As security for the line of credit previously mentioned, Mr. Bluford on March 31, 1977, executed an assignment to the Bank of the subcontract proceeds. The Bank sent a notice of the assignment to the Department of the Army at Fort Sill, and the assignment was acknowledged by the contracting officer on April 6, 1977, and by the Fort Sill Finance Office on May 13, 1977.
 
 
 9
 After obtaining the line of credit, it was Mr. Bluford's practice to go to the Bank, talk to Mr. Henderson, ask for a loan in the amount of $80,000, and sign a promissory note for it. The money from the loan would be deposited in the payroll account of Bluford Services. This occurred twice a month, with an interval of approximately 15-17 days between notes. Mr. Bluford was supposed to pay off any pending loan before receiving a new one.
 
 
 10
 Before the assignment of March 31, 1977, was executed by Mr. Bluford, checks due under the subcontract were made payable to Bluford Services and were mailed by Fort Sill to Mr. Bluford. After the assignment became effective, checks due under the subcontract were made payable to Bluford Services in care of the Bank, and were mailed by Fort Sill to the Bank.
 
 
 11
 When a check was received by the Bank from Fort Sill, payable to Bluford Services in care of the Bank, Mr. Henderson deposited the proceeds of the check in Mr. Bluford's payroll account, after deducting the amount due the Bank on the loan which the Bank had made for the period covered by the check. This customarily happened twice each month. Mr. Bluford would learn that a check had been received by the Bank because Mr. Henderson would call him on the telephone and inform him.
 
 
 12
 On or about February 25, 1978, by Modification No. 0025, the KP contract was modified to state in part as follows:
 
 
 13
 By mutual agreement, this contract can be terminated for convenience of the Government in the event a contract is awarded in IFB DABT39-77-B-0066, Cook and KP service, Fort Sill, Oklahoma, at any time prior to the expiration of this contract as extended through 30 September 1978, and the effective date for a termination for convenience of the Government of Contract DABT39-76-C-3164 will be at the end of the month in which a new contract is awarded on IFB DABT39-77-B-0066.
 
 
 14
 On March 10, 1978, Robert K. Ball ("Mr. Ball"), who was then the Acting District Director of the SBA in the Oklahoma City District Office and the only official in that office with contracting authority, mailed to Mr. Henderson a copy of the contract modification quoted in the preceding paragraph. In a covering letter addressed to Mr. Henderson, Mr. Ball stated in part as follows:
 
 
 15
 An extension to this contract through September 30, 1978 has just been executed on Modification No. 0025 (copy attached) between Fort Sill, SBA and Bluford. This extension was issued due to the fact that Fort Sill has not been able to award a contract to a responsible bidder on their IFB issued by them in July, 1977. It is our opinion that an award will not be made on this within the remaining period. If one is made, SBA and Bluford will be given at least a 30-day notice. If this does come into effect, this office will immediately notify you of the termination date.
 
 
 16
 * * * Your bank has an assignment on this contract in which all monies are received at your bank prior to being received by Bluford. Bluford is paid twice a month, once on the 15th in which he receives $135,000 for this period, and at the close of the month in which his check is for over $100,000. Your records at the bank should indicate this. You may want to consider raising his line of credit to $100,000.
 
 
 17
 On or about August 24, 1978, the Department of the Army notified Bluford Services and the SBA that the KP contract and the subcontract would be terminated effective August 31, 1978.
 
 
 18
 Despite the promise contained in the SBA's letter of March 10, 1978, neither the SBA nor Mr. Bluford gave the Bank any notice, oral or written that the KP contract and subcontract would be terminated effective August 31, 1978. Moreover, neither the SBA nor Mr. Bluford gave the Bank any notice, oral or written, that the KP contract and subcontract had been terminated effective August 31, 1978. The Bank did not learn from any source about the termination of the KP contract and subcontract until sometime after October 17, 1978.
 
 
 19
 On August 30, 1978, the Department of the Army at Fort Sill awarded a new food service contract directly to Mr. Bluford, d/b/a Bluford Services Company, for a 1-month period commencing September 1 and continuing through September 30, 1978. No formal assignment was executed with regard to this 1-month direct contract.
 
 
 20
 On September 8, 1978, Mr. Bluford went to the Bank and obtained a loan of $80,000 from Mr. Henderson. Then, on September 22, 1978, Mr. Bluford went to the Bank and obtained another $80,000 loan from Mr. Henderson without paying off the $80,000 loan he had obtained on September 8, 1978. This was contrary to the arrangement he had with the bank and also different from the custom and practice they had followed in the past, i.e., a second $80,000 loan would not be made until and unless a previous $80,000 note was paid off. Furthermore, this second $80,000 loan was in excess of the line of credit of $80,000 the bank had approved for him. At this point in time (September 22, 1978) Mr. Bluford owed the bank $160,000, which was $80,000 more than his bank approved line of credit.
 
 
 21
 On September 25, 1978, Mr. Bluford went to the Bank with a check in the amount of $110,000 he had received from the Army at Fort Sill dated September 22, 1978, in part payment under the one-month September 1978, contract with the Army. This was the first time since the assignment that Mr. Bluford had personal possession of a Fort Sill check without the express request and authorization of Mr. Henderson. This check was made payable as follows:
 
 Bluford Services Company
 P.O. Box 343
 Lawton, Oklahoma 73501
 
 22
 This change in payee, addressee, and method of delivery was a deviation from a long-term pattern of more than 30 checks. However, Mr. Henderson did not call Fort Sill to inquire as to this deviation.
 
 
 23
 Mr. Bluford delivered the September 22, 1978, check in the sum of $110,000 he had received from the Army at Fort Sill to Mr. Henderson. Mr. Henderson had Mr. Bluford endorse the check, contrary to his practice with checks received under the assignment, which were always processed only with the Bank's endorsement stamp. Mr. Henderson deducted the amount of $80,000 in payment of the loan which the Bank had made to Mr. Bluford on September 8, 1978, and he credited the remainder to Mr. Bluford's payroll account. None of the remaining $30,000 from this check was paid to or applied by the Bank on the outstanding loan which the Bank had made to Mr. Bluford on September 22, 1978, in the sum of $80,000.
 
 
 24
 On October 10, 1978, the Fort Sill Finance Office of the Army delivered to Mr. Bluford a check in the amount of $85,378.84, representing the last payment for services under the one-month direct contract. Mr. Bluford used the proceeds from this check to purchase two cashier's checks, one in the amount of $50,000 and the other in the amount of $35,000. He used the $35,000 cashier's check to pay off a loan which he had previously obtained from the Sheppard Air Force Base Credit Union, and he deposited the $50,000 cashier's check in his payroll account at the Bank. None of this $50,000 cashier's check was paid to or applied by the Bank on the outstanding $80,000 loan the bank had made to Mr. Bluford on September 22, 1978.
 
 
 25
 On October 17, 1978, after Mr. Henderson learned that Mr. Bluford had been injured in an automobile accident, he called the Department of the Army to inquire whether Mr. Bluford was due any more payments. At that time he learned for the first time about the termination of the assigned SBA contract and about the execution of the Army one-month direct contract with Mr. Bluford.
 
 
 26
 Thereafter, on November 6, 1978, the Bank filed an action against Mr. Bluford in the District Court of Comanche County, Oklahoma to recover the balance due on the September 22, 1978 loan of $80,000, and obtained a writ of attachment on Mr. Bluford's property. The Bank recovered approximately $5,800 from the sale of Mr. Bluford's janitorial equipment. However, the Bank did not apply these proceeds on the September 22, 1978 loan, but on a later loan made on October 10, 1978. On June 19, 1980, Mr. Bluford filed a voluntary petition in bankruptcy. However, he has not been discharged from his debt to the Bank.
 
 
 27
 The $80,000 loan the bank made to Mr. Bluford on September 22, 1978, has not been paid and it forms the basis of the bank's instant suit against the government.
 
 
 28
 The bank contends that an implied-in-fact contract was created between it and SBA when the SBA wrote the letter of March 10, 1978, in which it promised to immediately notify the bank of the termination date if the assigned contract was ever terminated. The bank says that this promise to the bank was made by SBA to induce the bank to continue making the $80,000 loans to Mr. Bluford, and that it relied on such promise and continued to make Mr. Bluford such loans. It alleges that the SBA terminated the contract on August 31, 1978, without giving a notice of such termination to the bank, and the bank continued to make loans to Mr. Bluford up to and including September 22, 1978, when it made the last $80,000 loan to him which remains unpaid and cannot be collected. The bank argues that, by failing to give the termination notice, the SBA breached the contract and should be required to pay the bank the amount of the note as damages.
 
 
 29
 The government says that the promise of SBA to give the notice to the bank was only a gratuitous offer of assistance to the bank and was not sufficient to establish a legally binding contract, and, furthermore, there was no consideration furnished by the bank for the promise, since the bank never answered the letter nor made any promise nor did any act in response to the letter. The bank counters by saying that it continued to make the loans because of the SBA promise and that it would not have done so without it.
 
 
 30
 After a trial, the Claims Court found that an agreement had been made between the parties by the making of the termination notice promise by the SBA on the one hand and by the continued making of loans by the bank to Mr. Bluford on the other hand. The court found further that the SBA failed to give the termination notice to the bank when it terminated the contract for the convenience of the government on August 31, 1978, although it did notify Mr. Bluford of the termination, but he did not inform the bank.
 
 
 31
 The Claims Court made the following pertinent findings of fact, among others, on these events:
 
 
 32
 In the present case, there was clearly a promise made by the SBA, but the scope of the promise and the return promise or performance (if any) which the SBA bargained for in exchange for the promise require discussion. Ostensibly, the promise, as set out in the SBA's letter of March 10, 1978, was to "immediately notify * * * [the Bank] of the termination date" in the event of the termination of the KP contract and subcontract for the convenience of the Government. This specific promise, however, was part of a larger whole.
 
 
 33
 The letter of March 10, 1978, as previously quoted, was obviously designed to induce the Bank to continue making loans to Mr. Bluford in connection with the performance of the subcontract, by reassuring the Bank that it would not sustain any financial loss by making such loans, because (1) under the assignment of the subcontract proceeds, the Bank would directly receive all payments due under the subcontract; and (2) as further protection for the Bank, the SBA would immediately notify the Bank if a decision to terminate the KP contract and subcontract were to be made before the expiration of the extended contract date of September 30, 1978. In essence, therefore, the SBA was bargaining for performance, rather than a promise, by the Bank (i.e., the continued making of loans to Mr. Bluford in order that the subcontract might be completed) in exchange for the SBA's assurance that the Bank would receive repayment for such loans.
 
 
 34
 The SBA was interested in, and only in, the continued making of loans by the Bank to Mr. Bluford in connection with the completion of the subcontract.
 
 
 35
 Notwithstanding these findings, the Claims Court held that under the peculiar facts of this case the events described above did not create any legal liability on the part of the government to pay damages to the bank because of its failure to give the termination notice. In this regard, the court made additional findings as follows:
 
 
 36
 Nowhere in the letter of March 10, 1978, was there any express or implied request that the Bank do anything by way of rendering financial assistance to Mr. Bluford in connection with any other contract or subcontract (such as the September 1978 1-month direct contract between Fort Sill and Mr. Bluford). Conversely, there was no express or implied assurance in the letter that the Bank would be repaid for loans made in connection with other contracts or subcontracts. Accordingly, the loan which the Bank made to Mr. Bluford on September 22, 1978, and on which the present action is based, was outside the scope of the agreement between SBA and the Bank arising from the letter of March 10, 1978.
 
 
 37
 The Bank was fully repaid for all loans which it made to Mr. Bluford in connection with the performance of the subcontract.
 
 
 38
 After making these findings, the court concluded:
 
 
 39
 It necessarily follows that the Bank's damages claim based upon an alleged breach of contract by the SBA cannot be sustained.
 
 
 40
 After carefully considering the decision of the Claims Court, the briefs and oral argument of the parties, we have concluded that, under all of the facts and circumstances in the case, the failure of the SBA to give notice of the termination of the assigned subcontract to the bank did not make the government legally liable to pay the bank the $80,000 due on the loan the bank made to Mr. Bluford on September 22, 1978. This is so for a number of reasons shown below.
 
 
 41
 In the first place, the bank as assignee of the subcontract received all of the funds paid by the government to Mr. Bluford for work done under the subcontract. The trial judge found that the bank was fully repaid for all loans which it made to Mr. Bluford in connection with the performance of the subcontract. This finding is fully supported by the evidence. Such full payment to the bank was the extent of liability of the government and discharged it from further liability under the assignment.
 
 
 42
 In the second place, as found by the trial judge, the $80,000 loan the bank made to Mr. Bluford on September 22, 1978, was outside the scope of the agreement between the SBA and the bank arising from the letter of March 10, 1978. There was nothing in that letter that either expressly or impliedly requested the bank to do anything by way of rendering financial assistance to Mr. Bluford in connection with any other contract or subcontract. Conversely, there was no express or implied assurance in the letter that the bank would be repaid for loans made in connection with other contracts or subcontracts. It appears from the evidence that the September 22, 1978, loan to Mr. Bluford was used by him in performance of the one-month contract between the Army and Mr. Bluford in which the SBA was not even involved, and which contract was not assigned to the bank. That contract was completely outside of the assigned subcontract, and the September 22, 1978, loan by the bank was in no way secured in its payment by the subcontract. Consequently, the loan was used in the performance of a contract other than the assigned subcontract, was unsecured, and was made without any privity of contract between the bank and the Army. Under these circumstances the government is not liable for the payment of the note.
 
 
 43
 In the next place, the loan of September 22, 1978, was outside the $80,000 line of credit approved by the bank for Mr. Bluford and was made at a time when he was already indebted to the bank for an $80,000 loan the bank had made to him on September 8, 1978. This resulted in a total indebtedness of $160,000 that Mr. Bluford owed the bank. Thus, it appears that the September 22, 1978, loan was not only unauthorized but also was contrary to the tacit understanding between the bank, the SBA and Mr. Bluford that no $80,000 loan would be made until and unless the previous loan in that amount had first been paid. This was the custom and practice theretofore followed by the bank in making thirty different loans in said amount to Mr. Bluford during his performance of the assigned subcontract. Had the bank not made the September 22, 1978, loan and thereby deviated from its understanding with the SBA and Mr. Bluford, as well as its past practice and custom in making these loans, and the line of credit authorization limitation of the bank, it would not have sustained the loss it now claims on that loan which remains unpaid. The government should not be held responsible for such negligent management by the bank of its financial affairs.
 
 
 44
 Finally, other facts should be mentioned which show that the $80,000 loss the bank claims it has suffered on the unpaid September 22, 1978, loan to Mr. Bluford was the result of the bank's own mismanagement and negligence in failing to apply funds on deposit in the bank in Mr. Bluford's account to the payment of the note. The record shows that from the date the subcontract was assigned to the bank by Mr. Bluford on March 31, 1977, until the date of the bank's last loan to him on September 22, 1978, 30 checks were issued by the Army at Fort Sill in connection with the work under the subcontract. Each of these checks was made payable to Mr. Bluford with the name of the bank inscribed thereon. Each check was sent to the bank and not to Mr. Bluford. The bank would process the check with a bank deposit stamp, pay off any unpaid $80,000 note, and notify Mr. Bluford the check had arrived. So far as the record shows, Mr. Bluford never saw the checks. Then on September 25, 1978, the procedure suddenly changed. On that date Mr. Bluford received a check in the sum of $110,000 in the mail from the Army at Fort Sill made out to him personally and without the bank's name being on the check. Mr. Bluford took the check to the bank and delivered it to Mr. Henderson, the bank official who had handled the account from the beginning. Mr. Henderson had Mr. Bluford endorse the check instead of using the bank's deposit stamp. This was the first time all this had occurred and was a radical departure from the procedure followed in the past. Mr. Henderson paid off the $80,000 loan the bank had made to Mr. Bluford on September 8, 1978, but instead of applying the remaining $30,000 of the check to the unpaid $80,000 loan the bank had made to Mr. Bluford on September 22, 1978, he deposited it in the account of Mr. Bluford for him to spend as he pleased. In our opinion, the foregoing incidents were constructive notice to Mr. Henderson that something was wrong and that a change had been made in the administration of the assigned subcontract. He was at least put on inquiry to find out about the situation. While knowledge of these events on September 25, 1978, could not have prevented the bank's loan to Mr. Bluford of $80,000 made three days earlier, such knowledge should have been sufficient warning to Mr. Henderson to alert him to the necessity or at least the precautionary desirability of applying the $30,000 remaining balance of the $110,000 check, as well as a $50,000 cashier's check described below, to the payment of the outstanding $80,000 note here involved. Yet he did nothing to reduce or pay off the note. He did not even inquire of the Army at Fort Sill or of the SBA at that time to find out why the payment procedure had been changed. On October 10, 1978, Mr. Bluford received another check in the sum of $85,378.84 directly from the Army at Fort Sill made payable to him and without the bank's name on the check. He purchased two cashier's checks, one for $50,000 and the other for $35,000. He went to the bank and delivered the $50,000 cashier's check to Mr. Henderson, who, instead of applying it on the $80,000 loan of September 22, 1978, deposited it in Mr. Bluford's checking account. Thus, it is clear that Mr. Henderson had control of the $30,000 from the first check and the $50,000 cashier's check and could have used them to completely pay off the $80,000 unpaid note which is the subject matter of this suit, yet he failed to do so. His negligence in this regard resulted in the complained of loss to the bank. The government should not be required to pay for this negligence of the bank and its officers.
 
 
 45
 The trial judge found that on November 16, 1978, the bank filed suit in the District Court of Comanche County, Oklahoma, against Mr. Bluford on the $80,000 note he had executed to the bank on September 22, 1978, and sought as relief a writ of attachment on his property, as well as a judgment against Mr. Bluford for $80,000, plus interest, attorney fees and costs. On February 22, 1979, the bank recovered a judgment in the suit against Mr. Bluford, and his property was sold at public auction under the writ of attachment. The sum of $5,800 was realized from the public auction sale, but the proceeds of the sale were not applied to the $80,000 loan of September 22, 1978, nor to the judgment recovered thereon in the suit, but were applied by the bank to a later loan which the bank had made on October 10, 1978, to Mr. Bluford, and which was secured by an assignment under another and different contract. The later loan was not involved in the suit. The act of the bank in this regard was rather unorthodox, because ordinarily when a litigant sues on a note and recovers a judgment and foreclosure of a lien on property which is sold at public auction, the proceeds of the sale are applied as a credit on the judgment and debt sued on and are not, and perhaps cannot be, applied on an entirely different debt not sued on as the bank attempted to do here. It is obvious that the bank tried deliberately and willfully by this maneuver to impose a debt on the government which it did not owe. While this transaction does not influence our decision in the instant case, it does indicate that, although the bank has accused the government of negligent wrongdoing throughout these proceedings, it appears that the bank itself did not always turn square corners in its dealings with the government.
 
 
 46
 The bank alleges that it did not receive any governmental protection of its interest under the Assignment of Claims Act, 31 U.S.C. Sec. 3727 and 41 U.S.C. Sec. 15. However, it does not make clear where or how the government failed to protect it under these statutes. All that this Act requires of the government is that it pay all amounts to the assignee that are payable under the assigned contract which have not already been paid. This was done in the instant case. The complaint is without merit.
 
 
 47
 The bank also alleges that judgment for the $80,000 should be entered in its behalf because the Army violated the Armed Service Procurement Regulation, 32 C.F.R. 8-203(b), by failing to give the termination notice to the assignee bank. The regulation provides that notice of termination of contracts which are terminated for the convenience of the government shall be provided by the procuring department to each known assignee. This contention is likewise without merit.
 
 
 48
 The procurement regulation nowhere mandates nor provides for the payment of compensation by the government to an assignee if the government violates the regulation. Therefore, no recovery can be had against the government on such a claim.
 
 
 49
 As the Court of Claims said in Eastport S.S. Corp. v. United States, 372 F.2d 1002, 1008, 178 Ct.Cl. 599 (1967), cited approvingly in United States v. Testan, 424 U.S. 392, 402, 96 S.Ct. 948, 955, 47 L.Ed.2d 114 (1976):
 
 
 50
 Where the claimant is not suing for money improperly exacted or retained ... the historical boundaries of our competence have excluded those instances in which the basis of the federal claim--be it the Constitution, a statute, or a regulation--cannot be held to command, in itself and as correctly interpreted, the payment of money to the claimant.
 
 
 51
 We find it unnecessary to consider other contentions made by the bank.
 
 
 52
 We wish to emphasize that we do not condone nor approve of the failure of the Army and the SBA to give the bank the notice that the contract had been terminated even though such failure imposed no liability on the government under all the facts and circumstances of this case. We agree with the Claims Court that as a matter of common courtesy and to retain the confidence of the public in the integrity of the government in its dealings with private citizens, the SBA should have given the notice to the bank.
 
 
 53
 The decision of the Claims Court dismissing the complaint is affirmed.
 
 
 54
 AFFIRMED.
 
 
 55
 BENNETT, Circuit Judge, dissenting.
 
 
 56
 I respectfully dissent because to me this is a clear and classic case of a contract implied in fact that has been breached by the government. Mr. Robert Ball, a government agent with authority to contract, made a written promise to the Bank to induce it to continue to extend credit to the contractor, Foxie Bluford, something it was otherwise reluctant to do because of his questionable financial condition. Mr. Ball promised that if there was a contract termination the Bank would be notified immediately. The promise was not kept. The Bank continued to extend credit in direct consideration of the government's written offer and by so doing lost $80,000. These vital facts are admitted. The Bank, therefore, is entitled to recover, less the sum of $5,800 it has obtained as a result of a state court judgment against the contractor.
 
 
 57
 In addition, the government breached its own Armed Services Procurement Regulation (ASPR), 32 C.F.R. Sec. 8-203(b) (1976), which provides that notice of termination of contracts, for the convenience of the government, must be provided by the procuring department to each known assignee. The ASPR is made applicable to SBA section 8(a) contracts by 32 C.F.R. Sec. 1-705.5(c)(1)(J) (1976). The majority opinion takes the position, however, that a breach of regulations does not give rise to a claim for money and thus recovery is barred, citing United States v. Testan, 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). This case does not support the majority's position. Testan was a claim of improper classification by civil service employees. The determination of their claim required an interpretation of the Classification Act and the Back Pay Act. It had nothing to do with contract law. It is hornbook law that the rights and positions of government employees derive from their appointment under statute, regulation, and Executive order. Testan made this clear and further pointed out that the claim in that case was not based on contract. 424 U.S. at 400.
 
 
 58
 The present claim comes to us on appeal from the Claims Court which has jurisdiction over government contracts "express or implied" under its Tucker Act jurisdiction, 28 U.S.C. Sec. 1491, amended by the Federal Courts Improvement Act of 1982, Pub.L. No. 97-164, 96 Stat. 25. We review under the latter. In short, where there is a government contract, express or implied in fact, the Claims Court has jurisdiction and the government is equitably estopped to deny its obligations under such contract. Russell Corp. v. United States, 537 F.2d 474, 210 Ct.Cl. 596 (1976) (equitable estoppel will be invoked to prevent the United States from denying existence of contractual agreement); Manloading & Management Associates v. United States, 461 F.2d 1299, 198 Ct.Cl. 628 (1972) (government estopped from disavowing promise regarding renewal of contract); Sylvania Electric Products, Inc. v. United States, 458 F.2d 994, 198 Ct.Cl. 106 (1972) (government estopped from disavowing oral understanding reached at bidders' conference). This is also the accepted view of other circuits, as shown from the uncontested authorities cited in appellant's brief.
 
 
 59
 Although the majority, therefore, in my view is wrong in its holding that violation of the regulation is meaningless and without a remedy, it is not necessary for appellant to recover to show that the government is estopped from making its argument about this regulation. It is sufficient to show that there is a valid implied contract here (the Claims Court did not deny that there was consideration for it) and that it was breached.
 
 
 60
 The majority view would deny recovery for this breach by arguing that the implied contract covered only the period of the original subcontract between the SBA and Foxie Bluford which was terminated on August 31, 1978, although it was not due to expire by its own terms until September 30, 1978. The Bank did not learn of the termination until after the middle of October because the SBA did not keep its promise to let the Bank know "immediately" if there was an early termination. The loan in issue here was made on September 22, 1978, while a one-month contract, not an extension of the earlier contract, was in effect, and at a time the Bank assumed, absent information from the SBA to the contrary, that the original contract was still in effect until September 30. Is it not strange to assert, as does the majority opinion affirming the Claims Court, that the SBA had an obligation to inform the Bank of a termination within the period of the original contract, but that the secret (to the Bank) termination of the contract by the government discharged any possible liability for the abrogation of its duty to inform the Bank if the contract was terminated? In effect, both the Claims Court and this court recognize an obligation on the part of the SBA that, in practice, is absolutely meaningless.
 
 
 61
 Finally, it is noted that the majority opinion says that the Army and the SBA should have given notice to the Bank, although not legally responsible for not doing so. The practical effect of this is to send a message to the public that you cannot trust the government, that you must assume that it will not keep its authorized, written promises, and that it will ignore with impunity its published regulations. The majority opinion is that, in believing otherwise, the Bank was negligent and cannot recover on that account. I had thought that the government was held to a higher standard and that it must turn "square corners" in dealing with the citizen. The Claims Court opinion, affirmed now on appeal, although denying any recovery, says that "[t]he Bank has reason to feel aggrieved." Indeed!